Filed 9/20/24  Roxanne R. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ROXANNE R., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF SAN FRANCISCO COUNTY, <br><br> Respondent; <br><br> SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br> Real Party in Interest. | A170877 <br><br> (San Francisco County <br> Super. Ct. No. JD223184) |

Roxanne R. (Mother) petitions this court for extraordinary relief from dependency court orders terminating her reunification services after an 18-month review hearing and setting a hearing under Welfare and Institutions Code section 366.26 to select a permanent plan for her three-year-old daughter D.B. (Minor).[1]  Mother argues that the juvenile court applied the wrong legal standard in determining that Minor could not be returned to her care, and that substantial evidence does not support the court's finding of a

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

1

substantial risk of detriment to Minor if she were returned to Mother.  We deny the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Petition and Detention*

On July 11, 2022, the San Francisco Human Services Agency (Agency) filed a dependency petition under section 300, subdivisions (a), (b)(1), and (j) on behalf of Minor, then 20 months old.[2]  Under section 300, subdivision (b), failure to protect, the petition alleged Mother was involved in a traffic stop for running a red light a few days before; that she had admitted to the police that she had several shots of alcohol before driving with Minor in the car; and that Mother was arrested for driving under the influence of alcohol.[3]  Minor was in the back seat of the car with a black eye and was taken to a hospital for evaluation.  Mother told hospital staff that Minor fell off a bike into a corner of the wall but she sent alleged father De.B. a text message stating, "Yup imma beat this lil girl ass all day long because of you."  The petition alleged that Mother had a history of anger management issues and used inappropriate physical discipline on Minor, as well as a history of mental health problems and alcohol abuse problems that required assessment and treatment, a history of being verbally and emotionally abusive to Minor, and a history of referrals to child protective services regarding her inability to appropriately care for Minor.  The petition also alleged that Mother and alleged father De.B. had a history of domestic violence and that alleged

---

[2] The petition also alleged that Minor came under subdivisions (a) and (j) of section 300.  The subdivision (a) allegations were later stricken, and the subdivision (j) allegations pertain only to alleged father De.B., who is not a party to this writ petition; accordingly, we do not discuss them further.

[3] The traffic stop occurred at about midnight; Mother's blood alcohol content was 0.123.

fathers De.B. and J.D. had anger management issues and substance abuse problems.[4]

At the detention hearing on July 12, 2022, the juvenile court ordered Minor detained in foster care. The court ordered supervised visits for Mother and granted the Agency discretion to allow unsupervised visits.

B.    *Jurisdiction and Disposition*

In its August 2022 jurisdiction and disposition report, the Agency recommended sustaining the petition, declaring Minor a dependent of the court, and providing reunification services to Mother. The Agency reported that Mother had been adopted by her paternal grandmother, who she regarded as her mother. Mother told the Agency she had witnessed domestic violence between her biological mother and father as a child and had suffered traumatic experiences as a teenager, had a history of mental health issues and trauma, and that she required therapy. Mother, who was then 22, also told the Agency that she had been in a four-year relationship with De.B., who was physically, verbally, and emotionally abusive to her throughout the relationship, which began when she was 16 years old. Mother reported that she had suffered multiple concussions, black eyes, and a broken finger; she had been strangled until she passed out; she had been punched in the stomach and face; and De.B. once tried to run her over. Mother had obtained restraining orders protecting her and Minor from De.B., but she and De.B. nevertheless had contact, and their interactions continued to be violent. As recently as July 2022 De.B. came up to her in a car, showed her a gun, and threatened to kill her. As for the black eye that Minor had on the day of

_____

[4] The trial court declared J.D. to be Minor's legal parent in September 2022, after a paternity test showed that he was her biological father. J.D. is not a party to this writ petition.

3

Mother's traffic stop, Mother said that while she was distracted because she was texting De.B., Minor fell off her toy bike and hurt herself. Mother said she was texting with De.B. because he had been "demeaning towards her" in texts he sent her the previous day. Mother said she sent De.B. texts the day of the black eye, including texts with pictures of Minor after she was hurt, to see if De.B. would come see her. Mother said that she drank alcohol that night because she was stressed out, but that she does not consume alcohol regularly.

The Agency reported that Mother had supervised visits with Minor twice a week for three hours per visit. Mother attended all scheduled visits and was generally engaged with Minor and attentive throughout the visits.

In an addendum report filed in mid-September 2022, the Agency reported that Mother continued to visit Minor consistently. Mother had been referred by the agency for a substance abuse assessment and domestic violence services but had missed intake appointments for both services and had not rescheduled them. She had been referred for random drug testing in July but had not completed a drug test. Mother reported she was arranging for therapy through her insurance, and the Agency was awaiting confirmation of the intake. Minor was doing well in her current placement, her second since being removed from Mother's care. Her caretaker reported that when Minor first came, she would "flinch" when the caretaker moved her hand near the child, and that Minor was "very aware of her surroundings and vigilant even from afar."

By the time of the October 2022 jurisdiction and disposition hearing, J.D. (Father) had been found to be Minor's biological father, and Minor had been placed with her paternal grandmother. At the hearing, the juvenile court sustained amended allegations as to Mother under section 300,

subdivision (b)(1), that Mother and De.B. had a history of domestic violence, including a history of violating the existing restraining orders and Mother engaging De.B. by threatening to hurt Minor or stating she had hurt Minor in order to provoke a reaction from him; that Mother had an extensive trauma history including being the victim of domestic violence and required mental health services to learn to stop engaging with her abuser and to stop using Minor as a means of antagonizing her abuser; and that in the wake of Mother's July 2022 arrest for driving under the influence with Minor in the car and leaving Minor without a caretaker, Mother's use of alcohol required assessment to determine whether treatment is warranted.

Mother's case plan included individual therapy addressing healthy relationships, trauma, codependence and the cycle of domestic violence; a substance abuse assessment; random drug testing; remaining under the care of a qualified mental health professional and complying with the professional's recommendations for therapy and medication; refraining from substance abuse; and complying with existing restraining orders. Mother was to receive a minimum of two visits with Minor each week.

C    *Six-Month Review and Subsequent Progress Report*

In a status review report filed on April 21, 2023, in advance of the six-month review hearing, the Agency recommended that Mother receive an additional six months of reunification services. According to the Agency, Mother admitted being inconsistent with respect to services and stated that her mental health issues affected her motivation and participation.

Although Mother reported to the Agency that she had completed a parenting class, she did not produce a certificate to verify completion, and the provider reported that mother had only attended a peer support group a few

times in the past year. Mother nevertheless expressed willingness to participate in parenting education, and the Agency would make referrals.

Mother had been referred to an individual therapist in December 2022, but did not follow through. In February 2023 the referral was reopened, and Mother had been participating since then, with the therapist reporting that Mother was open and engaged in the sessions.

The Agency reported that due to Mother's inconsistency in taking random drug tests, her level of substance abuse disorder was "unclear at this time." From July 2022 to January 2023, Mother was scheduled for 36 drug tests but took only five, only one of which was normal. One of the five was too dilute, and the others registered benzodiazepine and/or marijuana. Since January, Mother had tested more consistently, taking 12 of 17 scheduled tests, which were normal except for a February test that was positive for cocaine, which the Agency regarded as indicating a relapse, although Mother denied it. Mother had completed a substance use assessment in October 2022. Based on the referral information and Mother's report during the assessment (including her statement that her July 2022 DUI was a "one-time 'mistake'" and that she has not consumed alcohol since her arrest), the assessment did not recommend substance abuse treatment services. Mother later reported to the social worker that she used marijuana and unprescribed Xanax to help with anxiety and relax. Mother was receptive to a referral for a reassessment of substance abuse, which was being scheduled.

Mother completed intake for a domestic violence intervention program at La Casa de las Madres in October 2022, about two months after the referral. For months after intake and the development of a case plan, Mother's contact with the provider was "very sporadic," and Mother did not follow through with the service plan, but in March 2023, after several

6

discussions with the social worker, Mother reconnected with the provider and had since attended scheduled appointments. The Agency found no records of violations of the restraining orders protecting Mother and Minor from De.B., and Mother reported she had no contact with De.B.

The Agency reported that in December 2022, the court changed Minor's placement from her paternal grandmother to her paternal grandfather and step-grandmother, as stipulated by all counsel after the Agency filed a request under section 388 to change Minor's placement.[5] The Agency was arranging for parent/child dyadic therapy for Minor with paternal step-grandmother, and separately with Mother, to assist Minor with sleep issues, attachment, and managing emotions that resulted in biting, hitting, and yelling.

Mother's supervised visits with Minor had increased from two to three each week. Of 38 scheduled visits, Mother attended 29. The agency reported that the missed visits were caused by Mother being ill, or out of town or having other personal engagements. The Agency reported that Mother and Minor appeared to be caring, loving, and affectionate with each other during visits; that Mother engaged Minor in different activities, was attentive to her, and was attuned to her needs; and that when Minor did something unsafe or inappropriate, Mother corrected or redirected her.

---

[5] The Agency stated in its request that it had learned that paternal grandmother had a child abuse history in Nevada that she had not disclosed, and that there were conflicts between Mother and paternal grandmother, including a "verbal altercation" that occurred when, according to paternal grandmother, Mother "just showed up reeking of alcohol." During that incident, Mother and paternal grandmother were yelling and "using volatile language towards each other" in the presence of Minor, who "flinched" and appeared frightened. Mother and paternal grandmother minimized the impact of the event on Minor, stating it was only a single incident.

At the review hearing on May 4, 2023, the juvenile court found that Mother's progress toward alleviating the causes necessitating placement was "adequate." The court continued reunification services, granted the Agency discretion to allow unsupervised visits, and scheduled a progress/status report on Mother's visits for August 2023.

In its August 2023 progress report, the Agency reported that Mother was "complying with her case plan services and making good progress." Mother had three monitored visits with Minor each week. Mother completed a substance abuse assessment in June 2023 and met the criteria for outpatient treatment; she reported that she started outpatient treatment at Sister's Circle on August 21, 2023 and was attending two groups each week. After Mother had several drug tests that were positive for alcohol and/or marijuana, some missed tests, and some dilute tests from April through July 2023, the Agency postponed allowing unsupervised visits. More recently, however, Mother's tests were negative except for marijuana, and Mother was to begin unsupervised visits with Minor in early September, three times per week for up to five or six hours. The Agency asked for discretion to move the visits to overnights. The court granted the Agency's request on August 31, 2023, adding, "Mother shall test clean without any diluted testing."

D.    *Twelve-Month Review*

On September 29, 2023, in advance of the scheduled 12-month review hearing, the Agency filed a report recommending that Minor reside in Mother's home with family maintenance services. Over the past month, Mother consistently engaged in services, including the SafeCare parenting program, and the service providers reported Mother was progressing well. Mother maintained negative tests for substance use. Unsupervised visits with Minor were going well and had recently expanded to overnights without

8

any reported issues. Minor had participated in dyadic therapy with paternal step-grandmother, which both the therapist and paternal step-grandmother reported as going well. Dyadic therapy was now focused on working with Mother and Minor to prepare for changes in Minor's routine and activities as she transitioned back to Mother's care. There had been difficulties with the sessions, because of scheduling problems, locations, and distractions, and the social worker had assisted in arranging for sessions to be held virtually at Mother's home.

But on October 5, 2023, the Agency filed an addendum report recommending that Minor's out-of-home placement continue, that an additional six months of services be provided to Mother, and that Mother's visits once again be supervised. The reason for the changed recommendations was that the Agency had received reports of a domestic violence incident between Mother and Father while Minor was visiting Mother overnight.

Minor's paternal step-grandmother, with whom Minor had been placed, told the social worker that on the evening of September 27 she was having a video call with Minor, who was staying with Mother. Minor cried during the call and said she did not want to stay with Mother that night. The next day, coming home from day care, Minor told paternal step-grandmother, "My daddy hit my Mommy." The paternal step-grandmother reported that Father told her he had been at Mother's home and everything was going well at first, but later Minor did something Mother told her not to. Mother repeatedly told Minor to stop and then told Minor, "You'd better . . . slap the F--- out of you," and this started a fight between Father and Mother, which escalated. Father reportedly admitted to his step-mother that he hit Mother, and said that Minor was present the whole time and witnessed everything. Questioned by

9

the social worker, however, Father said only he went to Mother's in the early morning hours of September 27, knocked on the door and argued with Mother, but did not go inside, and left when Mother said she would call the police.

Minor's day care provider reported that throughout the day on September 28, 2023, Minor kept saying, "My daddy hit my mommy and he hit me too."

When the social worker asked Mother about the incident, she said there was no domestic violence, and that Father showed up uninvited at 2:30 in the morning on September 27 while she and Minor were sleeping. Father banged on the door demanding to be let in and threatening to kick in the door, so Mother opened the door and asked Father to leave, which he did. Mother reported that Minor woke up because she heard Father at the door. Minor was concerned, asking "Why is daddy yelling, Are you OK?" but did not cry and went back to sleep. Mother told the social worker she had called the police about the incident, but the police had no record of a call from Mother. Mother also said she had called her therapist and talked with her about the incident for support. The therapist reported Mother did not call her about the incident.

On October 2, 2023, the social worker asked Minor about her parents. Minor said, "Do you remember my daddy hit my mom and he hit me too?" Minor told the social worker that Father was in the house while she was watching TV; that Mother spit at Father, and told him to get out; that Father hit Mother on the face. Minor also said that Father hit Minor's chest, and while describing that she held her hand out, palm open, in a gesture that suggested someone holding a person back. Minor said that what happened made her sad.

10

The Agency observed that although Minor witnessed verbal and physical fighting between Mother and Father and expressed negative feelings about it, Mother did not appear to be taking the matter seriously or to understand that Minor was adversely affected. The Agency expressed concern about Mother's truthfulness, accountability, judgment, and failure to follow through with safety and visitation plans, and about recurring altercations if Mother's visitation with Minor was left unsupervised, which would place Minor at risk of significant harm. The Agency concluded that Mother's role in the relationship with Father and her ability to keep Minor physically and emotionally safe should be reassessed and addressed through therapy, domestic violence services, and safe parenting practices.

At a hearing on October 5, 2023, the juvenile court changed Mother's visits to supervised. The court also granted a temporary restraining order against Father protecting Mother and Minor.

At a hearing on December 13, 2023, the application for restraining order was dissolved, and the juvenile court gave the Agency discretion to arrange a supervised overnight Christmas visit for Mother, and continued the matter to January 12, 2024 for a contested 12-month review.[6]

The Agency filed an addendum report on January 3, recommending that Minor remain in her out-of-home placement and that additional reunification services be provided to Mother. The Agency stated that its recommendation was based on mother's inconsistent engagement with support services, and the dyadic therapist's concerns that Minor's play became more aggressive after the September 2023 incident with Father and that Mother was redirecting Minor's thought processes by telling her things

---

[6] Subsequent dates are in 2024 unless otherwise stated.

11

such as "I didn't do that" when Minor recounted her perception of events. The Agency reported that Mother was regularly being tested for substances with negative test results, and was attending visits with Minor, but Mother's contact with several of her service providers, including the domestic violence program at La Casa de las Madres, the SafeCare parenting program, and her individual therapist, was sporadic. After being informed that the referral to the therapist and domestic violence program would be closed as a result of Mother's lack of contact, Mother contacted those service providers. Mother had not attended the Sister's Circle substance abuse program since November 2023, although she was supposed to attend twice each week.

Paternal step-grandmother, Minor's caregiver, reported to the Agency that Minor's sleep behaviors had been affected by the September 2023 incident, with Minor turning in circles in bed, getting up and down out of bed rapidly, whimpering in her sleep, and talking in her sleep, saying "Daddy hit." Paternal step-grandmother said she knows the incident upset Minor, because when Minor was upset she liked to talk about things "to everyone that will listen" and Minor was "oversharing" to several people the story of witnessing the incident. Paternal step-grandmother also reported that Minor told her, "Daddy didn't hit mommy, mommy told me," and she expressed concern that Mother may be upsetting Minor by telling her false information.

At a hearing on January 12, the matter was continued, and eventually a contested combined 12- and 18-month hearing was scheduled for May 20.

E. *Combined 12- and 18-Month Review*

1. *Agency Reports*

The Agency filed a status review report on February 1, and two addendum reports, one on May 7 and one on May 17. In each of those

reports, the Agency recommended that the court terminate reunification services and set a permanency planning hearing.

a. *February 2024 Report*

In February, the Agency reported that Mother's consistency and engagement in services related to parenting skills, individual therapy, substance use, and domestic violence had decreased after the September 2023 incident with Father. The dyadic therapist reported that she had advised Mother to speak openly with Minor about the September domestic violence incident, and not downplay it, in order to see how Minor feels about it, but Mother had not yet done that. Minor told the therapist that Father had apologized to her for the incident, but Mother had not. The therapist stated that it was important for Mother to not correct Minor's telling of the story and experience, but instead to have a conversation with Minor "to help her through past traumas." The social worker observed Minor's behavior at her daycare and saw her taking her baby dolls and hitting their faces with blocks and crushing them to the floor. There were some positive developments: the Agency reported that according to the police, "no calls out" to Mother's apartment had been received in the wake of the September incident with Father, and Mother's supervised visits with Minor were reported to be going well. The visit supervisor at SafeCare, the provider of Mother's parenting services, reported that Mother was implementing tools they had worked on, such as developing patience with Minor. The supervisor assessed that Mother and Minor required "re-bonding" after the September 2023 incident and Mother needed to practice praising Minor, setting expectations with her, and boosting her self-esteem.

The Agency recommended terminating services because Mother had not made the behavioral changes needed to protect Minor, as reflected in

Mother's inconsistent participation in the services that were provided to support her and her response to the September 2023 incident with Father. The Agency reported that the paternal grandfather and step-grandmother, with whom Minor had been placed since December 2022, expressed their commitment to ensuring Minor had a sense of belonging and permanency by adoption or guardianship.

b.    *May 7, 2024 Addendum Report*

The Agency's May 7 addendum report addressed an incident that occurred in March, which the Agency viewed as highlighting Mother's continued pattern of involvement in violence. During a supervised visit between Mother and Minor on March 21, the social worker noted a bruise on Mother's eye and a cut on her neck. Mother told the social worker that the bruising was from pink eye. The next day, the visitation supervisor asked the social worker if she had noticed what he referred to as Mother's "black eye." When the social worker asked him whether Mother said anything to him about the bruising, he responded that she did not. After consulting with her supervisor and the city attorney the social worker ran a police activity report from which she learned that there were two calls to Mother's apartment on March 17, 2024, one logged as "Assault Taken into Investigation." The police report of that incident identified Mother as a witness who was not on the scene at the time the report was taken.[7] According to the police report, the victim of the assault, who seemed to the officer to be withholding some information, reported that she was visiting Mother, who was her friend, and that during the visit someone called Mother and told her that the victim's car was being vandalized. The victim went

_____

[7] The police report was filed with the juvenile court on May 20, in an amendment to the May 7 addendum report.

14

outside and saw the suspect (who she identified as someone who was dating Mother and was angry with Mother) near her car; the car windows were smashed and the tires were slashed. The suspect admitted he broke the windows and slapped the victim across the face, knocking her down. The victim said she had no issues with the suspect; the incident was unprovoked; and the suspect likely vandalized her car and hit her because he was angry with Mother. The victim told officers that Mother and the suspect then left in an unknown vehicle. When called by police officers, Mother stated she was in Oakland and denied any sort of incident or disturbance. The Agency expressed concern that an assault occurred at Mother's apartment just four days before Mother was observed to have a black eye; that Mother never admitted "to any violence throughout the case"; and that Minor's emotional and mental well-being would be affected by witnessing Mother's involvement in domestic violence, or the remnants of such violence, such as seeing Mother with a black eye.

### c. *May 17, 2024 Addendum Report*

On May 17, the Agency filed a second addendum report to address additional evidence of Mother's continued involvement in domestic violence. On May 7, the social worker learned troubling information from Minor's counsel about events that occurred on May 4 and in the days prior. At a May 4 visit between Minor and Mother at the home of maternal grandparents, who were supervising the visit, Mother was observed to have another black eye. Police officers went to the maternal grandparents' home that day, having been called to investigate an invasion of Mother's apartment by an unknown suspect. Apparently, sometime before May 4, maternal grandfather went to Mother's apartment to repair damage to the door after a man had broken into Mother's apartment. The suspect sent Mother a video

15

of him inside her home. Minor later told the social worker that police came to the home and said hello to her. Paternal step-grandmother reported that after the May 4 visit, Minor was "shaken up" by seeing the police, asked why the police were there and whether the police were good or bad, and kept discussing the officers until bedtime. Minor was reported to have had sleep problems after that incident.

The social worker called Mother on May 8 and asked about the police involvement. Mother reported that she had been at a friend's house and someone stole her phone, so she made a police report for stolen property, which is why the police went to her parents' home to investigate. Mother denied having any marks or bruises from recent domestic violence and stated that the last incident of domestic violence in which she was involved was the September 2023 incident with Father. Mother also said that she had filed for an "emergency transfer" to a new apartment. Asked by the social worker whether she felt unsafe or threatened, Mother responded that she did not feel in immediate danger but wanted somewhere to have a fresh start.

The social worker then requested police call logs and police reports associated with Mother's apartment and maternal grandparents' home. The call logs showed two calls categorized as "Person with a Gun"; one "Prowler", and one "Confidential Information." The social worker received three police reports labeling Mother as "victim," dated April 16, May 4, and May 5, 2024.

According to the April 16 police report, Mother reported that a person she referred to as "Boo" knocked on her door and asked to be let in. Mother would not let him in and asked him to leave. Boo became upset and started to break open the door. Mother called a friend for help, and when she opened the door for the friend, Boo tried to force his way in. The friend and Mother closed the door before Boo could get in. Mother told the police that she and

Boo had been in an on-and-off sexual relationship for about three months, and there was one prior undocumented domestic violence incident in which Boo struck her.  Mother's friend told the police that once she was inside Mother's apartment, she looked through the peephole and saw Boo pointing a black firearm at the peephole.  She then heard the door handle and peephole being damaged and called emergency dispatch services to inform them of the incident.

According to the May 4 police report, Mother had a fading bruise on her right check and a scratch on her neck.  Mother told police that about three days before, her former boyfriend had entered her residence without her permission by using keys that he took from her on April 28.[8]  Mother said that for the past two weeks, the former boyfriend had been harassing her and that she was afraid for her life because of his messages to her, which included photographs of him inside her apartment and in his car outside her apartment, an image of what appeared to be a gun, and a message stating he would "Put 800 on yo shit," which she interpreted to mean that he would pay someone $800 to kill her.  Mother said that she and the former boyfriend had been dating for about five months and ended the relationship in April.  She said there was one prior documented incident of domestic violence between them, which the police officer was unable to locate after computer inquiries, and 10 prior undocumented incidents, the most recent of which was on April 28.  Mother reported that on April 28, she was sleeping when the former boyfriend entered her apartment.  Mother told him to leave, but he grabbed her phone, keys, television, and identification documents from her with force and punched her in the face on her right cheek.  He then pushed her onto the

_____

[8] Mother later testified that the former boyfriend and Boo are the same person.

bed and began to strangle her, saying "I'll kill you." Eventually she "pushed away," which caused him to stop. Mother declined shelter and stated she would stay at her parents' house. According to the police report, an emergency protective order was granted and the former boyfriend was arrested.

The May 5 police report concerned a search of the former boyfriend's car, which turned up a loaded semi-automatic handgun.

The Agency expressed concern that Mother demonstrated a cyclical pattern of engaging in relationships characterized by domestic violence, having had three such relationships within a two-year span. The Agency stated that as of May 2, Mother's case manager at La Casa de las Madres, the domestic violence intervention service provider, continued to report that Mother was inconsistent in engaging in services. The Agency was concerned that Mother's behaviors had not changed over the course of the case; that because Mother had not shown the capacity to work with the Agency to develop skills or understanding of the impact of domestic violence, the Agency lacked confidence that Mother would be able to address those issues with Minor in the home; that Mother would not be able to provide Minor a home free of violence; and that living in a home with potential threats of gun violence, threats to Mother's life, and assaults would put Minor physically at risk and damage her emotional and mental well-being.

2    *Contested Review Hearing*

A contested hearing was held on May 20, June 6, and July 5, 2024. Because the court's initial detention order had been made on July 12, 2022, the last day of the hearing was just one week shy of two years since Minor had been removed from Mother's care when she was 20 months old.

a. *Testimony*

The court heard testimony from six witnesses: two social workers, Mother's domestic violence program case manager, the supervisor at Mother's parenting program, maternal grandmother, and Mother.

Social worker Amy Yim testified that she was assigned to the case from October 2022 to October 2023, and that from the time of the six-month review in April 2023 up to October 2023 Mother consistently attended visitation and consistently engaged with some services but not with others. She explained that after the September 2023 incident with Father, the Agency changed its recommendation about returning Minor to Mother's care based on Mother's lack of truthfulness about her efforts in the wake of the incident, her failure to acknowledge what had happened or take responsibility for her actions, and her failure to understand the impact of the incident on Minor. Although Minor talked about the incident, Mother did nothing to address it, and instead minimized it. Mother continued to deny that a physical incident occurred, even though she had told Yim there was yelling, she threatened to call the police, and that Father was kicking on the door.

Social worker Sabrina Degnan testified that she worked on Mother's case from October 2023 to the present, and discussed Mother's participation in services. She had observed several supervised visits between Mother and Minor and reviewed the notes from other visits. Although the visits went well, the Agency was not comfortable moving to unsupervised visits after the September 2023 incident because Mother was not consistently testing for substances, attending therapy, and participating in the domestic violence program. She had discussed these concerns with Mother several times. She testified that Minor had no issues transitioning in and out of visits with Mother but had sleep issues after the September 2023 incident with Father

19

and also after she saw police officers going to maternal grandmother's home on May 4, 2024. She expressed concern about returning Minor to Mother's care, explaining that a primary reason the Agency became involved was because of the physical, emotional, and mental risk posed to Minor by domestic violence, and that in view of the various police reports, it was clear to her that there was still violence with Mother and her relationships, some reported to law enforcement and the Agency, and some not. She did not believe that Mother had developed the skills and behaviors to create a home for Minor that was free of violence. Her recommendation to the court was based on Mother's lack of consistency with respect to services, and Mother's lack of honesty about the incidents of domestic violence in her life during the pendency of the case, including Mother's insistence that the police report on May 4 was not about domestic violence, but was about a stolen phone.

Nithya Sharma, Mother's case manager at La Casa de las Madres since October 2023, testified that Mother's participation in the domestic violence intervention program was "minimal and inconsistent." She reported Mother had recently sought support for an incident of domestic violence that occurred with her former boyfriend.

Aysha Franco, an employee of Family Support Services of the Bay Area, had supervised the person who provided Mother's SafeCare parenting education. Franco reported that Mother began the program in June 2023, and completed it in January 2024, after an interruption in October and November 2023.

Minor's maternal grandmother testified that for the past year and a half she supervised Mother's visits with Minor one day a week. At first, the visits were two or three hours each, and then up to seven or eight hours, with four or five overnight visits. She testified that she had no concerns about

Mother doing anything unsafe with Minor; that over the past year and a half Mother had become very patient with Minor and able to see when she needed a rest or food; and that although Minor was "at an age where she is beginning to push buttons," Mother was "doing a very good job." Asked about the time the police came to her home in May 2024, she stated that Mother made the decision to call the police on her own, without being urged to do so.

Mother's testimony began on June 6 and concluded at the next hearing date on July 5. Mother reported that she had "done countless classes, therapy sessions, drug tests, anything that they recommended," and that although she was "not one hundred percent consistent," she had learned a great deal. Mother denied that she ever had a substance abuse issue, and said that at the present time she was not regularly drinking or using drugs. As for parenting skills, Mother said she had learned patience and learned how to understand Minor's emotions, how to keep Minor safe, and how to help Minor understand and express her own emotions. She stated that she and Minor loved each other, and described how they expressed their love for each other. She stated that the most recent time she was involved in domestic violence, she "stopped it almost as soon as it began, because I know the signs and I have learned the cycle of violence, and I'm willing to take all of the precautions and relocate and everything that it takes."

Asked about the September 2023 incident with Father, Mother testified that she was honest with the social workers about what happened that night, but not about calling the police or calling her therapist, because she did not want anything to interfere with reunifying with her daughter. She said that she understood now "that is not the way to go about situations at all, because trying to hide things is just—makes everything worse." Mother said that she currently had a scar on the left side of her neck from a curling iron burn,

21

which had been there for about a month and a half, including when she was interviewed by the police on May 4.  At the time of that interview, she had been staying at her parents' house for about a week to get away from the ex-boyfriend who had texted her that he was outside her apartment and then sent a video of himself getting into her apartment.  She denied that she had any visible bruising on her face at the time of the interview.  She did not recall that she told the police on May 4 about the incident a few days earlier where the ex-boyfriend punched her in the face; nor did she recall that she told the police he had strangled her.  She admitted telling the police there had been at least 10 prior incidents of domestic violence between them in their three to four month relationship.  She also admitted that she did not volunteer to the social worker any information about these recent incidents of domestic violence, which involved a new partner.  Asked why she did not contact the social worker at the time of the incidents, she said, "Honestly, I don't know."  She admitted that in a phone call on May 8, 2024, when the social worker asked about the police coming to her parents' house, she did not tell the social worker the reason she had called the police.  And she admitted that during that phone call she told the social worker there had been no incidents of domestic violence since September 2023 and that she did not feel unsafe.

b.     *Exhibits Admitted into Evidence*

The Agency introduced its reports into evidence, including a July 1 addendum to assess Mother's recent engagement and attendance with services.  The July 1 report included the following information:  On June 20, Nithya Sharma reported that Mother's participation in domestic violence services at La Casa de las Madres was inconsistent and that Mother engaged only when she was informed that her referral would be closed.  Mother's last

contact was a "brief" check-in on May 31 (which was after the last hearing date). Mother missed an appointment on June 11 and failed to reschedule or respond to messages until Sharma told her earlier that day, June 20, that her case would be closed. Sharma's assessment was that no patterns were changing, and she reported that Mother's referral would be closed if she missed one more appointment. On June 20, Mother's dyadic therapist reported that she would be closing Mother's chart because Mother had not engaged in services for two months or more. On June 26, Mother's individual therapist reported that Mother had " 'started off strong' but progressed to not being consistent." On more than one occasion, the therapist had planned to terminate the referral because of Mother's inconsistency. In May, Mother attended two of four scheduled sessions. In June, Mother was offered three sessions and attended none. As for other services, Mother completed her SafeCare parenting program in January 2024; she last attended a Sister's Circle substance abuse class in November 2023 and had not sought to engage in the program since then. In May and June, Mother missed 10 substance abuse tests. Of the three tests she took, two were negative for substances and one was positive for THC. From May 31 through June 23, Mother failed to call the testing center to learn whether she was required to test.

Mother introduced three exhibits that were admitted into evidence. One exhibit was a closing summary dated January 25, 2024 from the social worker at Mother's SafeCare parenting program. The social worker described Mother as "a very engaged and committed client who put in work to improve her parenting skills," and noted that although Mother "became uncontactable" in early October 2023 after the September 2023 incident with Father, she resumed the program at the end of November 2023 and completed it in January 2024. The other two exhibits were delivered service

23

logs that discussed visits between Minor and Mother on January 30 and February 6. The visit supervisor observed on January 30 that Mother was attentive and responsive to Minor, that Minor felt comfortable and secure in Mother's presence, and that their interactions demonstrated a strong and loving bond. On February 6, the supervisor observed that Minor became frightened and upset by witnessing an incident between a security guard and a rude customer. Minor clung to Mother, expressing signs of distress and anxiety, and Mother acted quickly to comfort and reassure minor, handling the situation with patience and sensitivity, and demonstrating what the supervisor characterized as a commitment to providing a safe and supportive environment for Minor.

c. *Closing Arguments and Ruling*

After Mother's testimony was completed, the court heard closing arguments from counsel.

Mother's counsel argued that Mother's recent positive steps in dealing with her ex-boyfriend by staying with her parents, cooperating with the district attorney, and finding a new place to live showed that Mother was changing her behavior and doing things to keep herself and Minor safe. Mother's counsel urged the court to overlook the recent domestic violence incidents and instead focus on the positive interactions between Minor and Mother, and return Minor to Mother's care with a period of family maintenance services.

Minor's counsel argued that the evidence showed Mother had not made the progress and behavioral changes that would allow Minor to safely return to her care. Minor's counsel acknowledged that Mother had been consistent in visiting Minor but focused on Mother's inconsistent engagement in services, long history of domestic violence, and lack of credibility, including

24

her failure to be honest or forthcoming to the Agency with information about the abuse she suffered in April and May.

The Agency's counsel emphasized Mother's lack of engagement in services, including domestic violence support services, therapy, and substance abuse services, and argued that there was no current information or evidence that Mother had addressed the concerns about substance abuse, even though the case began as a result of Mother's DUI arrest with her 20-month-old in the car. The Agency argued that after almost two years, Mother had not gained the tools to protect Minor and not expose her to situations that could endanger her. The domestic violence incident in September 2023, when Minor was present, and the more recent incidents, about which Mother had not been truthful and forthcoming, were considerations for the Agency in making its recommendation, as was the fact that Mother's visits were still supervised and the Agency was not comfortable changing the visits to unsupervised.

After hearing argument, the juvenile court pronounced its orders, terminating Mother's reunification services and setting a hearing to select a permanent plan for Minor under section 366.26. The court recognized that Mother made "some growth" over the past 24 months, specifically in understanding "that there are circumstances that and conduct that you have engaged in that has not only placed yourself in danger, but has also negatively impacted your daughter." But Mother failed to "adequately address your alcohol and substance abuse uses" and to "meaningfully engage in services that would lead to behavioral changes that are necessary in this case." The court stated that it found that the conditions that led to the court's assumption of jurisdiction under section 300 still existed and that

returning Minor to Mother's care would create a substantial risk of detriment to Minor.

Although the Agency had recommended reducing visitation to twice per month, the court maintained the existing visitation order, which allowed two supervised visits each week. Mother's writ petition timely followed.

## DISCUSSION

### A. *Applicable Law and Standard of Review*

When a child under the age of three is removed from the physical custody of his or her parent, reunification services are generally to be provided for six months from the dispositional hearing, but no longer than 12 months from the date the child entered foster care, unless the child is returned to the parent's home. (§ 361.5, subd. (a)(1)(B).) Under certain circumstances reunification services may be extended up to 18 months from the date the child was removed from the parent's physical custody. (§ 361.5, subd. (a)(3)(A).) At the 18-month review hearing, a child must be returned to the parent's custody "unless the court finds, by a preponderance of the evidence, that the return of the child to the physical custody of their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) It is the Agency's burden to prove detriment. (*Ibid.*) "[T]he risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.)

In determining whether there is a substantial risk of detriment, the juvenile court "shall review and consider the social worker's report and recommendations" and "shall consider the efforts or progress, or both,

26

demonstrated by the parent . . . and the extent to which they availed themselves of services provided." (§ 366.22, subd. (a)(1).)

The substantial evidence standard governs our review of the juvenile court's determination that a dependent child will suffer detriment if returned to the parent's physical custody. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.) Accordingly, "we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' [Citation.]" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.)

B.    *Legal Standard Applied by the Juvenile Court*

Mother argues that the juvenile court applied the incorrect standard when it determined that Minor should not be returned to Mother's care. Mother argues that instead of finding a substantial risk of detriment, the juvenile court "incorrectly establish[ed] its own standards" for returning Minor to Mother's care, and based its ruling on its belief that Mother could not "provide the 'safest home' " for Minor, and on its "concern[ ] with harm that 'potentially' could occur." The argument is not at all persuasive. It focuses on two words used by the juvenile court, "safest" and "potentially," taken out of context, and disregards the juvenile court's explicit statement of the legal standard it was applying and the factual basis for its findings.

After hearing arguments from counsel, the juvenile court began its ruling by explaining to Mother that its "primary job [was] to assess the case and look at both the progress . . . that you have made throughout the last 24 months as well as really determine what your capacity is at this point in time

27

to ensure that [Minor] is both safe and protected." The court recognized that Mother had made "some growth," acknowledged that "dependency proceedings are tough," and stated that there was no doubt that Mother and Minor loved each other. The juvenile court continued by stating that its primary concern was for Minor, and its "ultimate objective" was to "place[ ] her in what is the safest position and the safest place that she can be." Taken in the context of the juvenile court's comments as a whole, including the statements and findings that followed the court's introductory comments, we do not interpret the court's remark about the "safest position and the safest place" as applying an improper legal standard for deciding not to return Minor to Mother's care.

That the juvenile court understood and applied the correct legal standard is shown by the court's subsequent statements reflecting the statutory language as set forth in section 366.22, subdivision (a)(1): "The court has received into evidence and read and considered the exhibits that have been admitted . . . . [¶] With respect to the Court's findings, the court does find that conditions still exist with respect to the initial assumption of jurisdiction under Section 300. [¶] *And return of [Minor] to [Mother] would create substantial risk of detriment to the safety, protection, emotional or physical well-being of the child.* [¶] . . . [¶] The Court finds by clear and convincing evidence that [Mother] failed to participate regularly and make substantial progress in the Court-ordered treatment plan." (Italics added.)

Further, as required by statute, the juvenile court "specif[ied] the factual basis for its conclusion that return would be detrimental." (§ 366.22, subd. (a)(2).) The court stated, "[T]he question is . . . at this time, should your daughter be returned to you. [¶] And based upon the information contained in the reports and the testimony as well as really critically looking at where

28

you were and where you currently are . . . the Court is unable to return your child to you today. [¶] . . . [¶] . . . [T]he Court's ruling is primarily based upon your failure to consistently engage in meaningful services that were designed to try to address some behavioral issues. [¶] The Court based upon the evidence can only find that, unfortunately, some—certain conduct that you have engaged in has continued to place both yourself and in [*sic*] severe physical danger, but also potentially your daughter in terms of both physical danger and emotional harm. [¶] The Court also based upon the testimony finds that you have failed to adequately address your alcohol and substance abuse uses, and again, meaningfully engage in services that would lead to behavioral changes that are necessary in this case."

The juvenile court's statement that Mother's behavior "potentially" placed her daughter in "physical danger and emotional harm" is consistent with the statutory requirement that the court find a "substantial risk of detriment" (§ 366.22, subd. (a)(1)) and the court's statement that it had in fact found that "substantial risk of detriment." A "substantial risk" is necessarily "potential."

Accordingly, we reject Mother's argument that the juvenile court's determination that Minor could not be returned to Mother rested on incorrect legal principles.

C.     *Evidence Supporting the Juvenile Court's Findings*

In arguing that the juvenile court's findings are not supported by substantial evidence, Mother simply does not address much of the evidence that was before the court. Instead, she focuses on selected items of evidence that might support different findings, essentially asking us to reweigh the evidence. This we will not do.

In challenging the juvenile court's findings that Mother failed to consistently engage in meaningful services to address behavioral issues and that Mother engaged in conduct that put Minor at risk of physical danger and emotional harm, Mother argues that "[a]t times" she participated in services, and that "she had moments of doing 'incredibly well' and being 'open and engaged' in services." Mother emphasizes the quality of her visits with minor. Mother contends that by maintaining twice-weekly supervised visitation after the termination of reunification services, the court recognized the importance of the relationship between Mother and Minor, which "is in direct contravention" of a finding that Minor was at risk of detriment in Mother's care. We see no contradiction here, which accounts for Mother's failure to cite any authority that supports this point. Significantly, Mother does not directly challenge the court's finding that she engaged in conduct that put Minor at risk of physical and emotional harm, except to point out that she complied with the protective orders against De.B. and had no contact with him during the proceedings.

In arguing about her engagement in services, Mother cites evidence that her parenting skills improved over the course of her participation in SafeCare classes. She also notes that as part of her case plan she received services from La Casa de las Madres and cites a report describing the period from June to September 2023 as evidence that she spoke to a peer counselor, gained insight, learned to recognize triggers and red flags, and had created a safety plan. But she does not discuss the evidence that starting in October 2023 her engagement with services at La Casa de las Madres was "minimal and inconsistent." She does not discuss her failure to participate in substance abuse classes or her record of positive test results and missed tests, glossing over the fact that the dependency proceeding began after she was

30

arrested for driving while intoxicated and that Minor was in the car at the time. She does not discuss her inconsistent participation in individual and dyadic therapy. We conclude that substantial evidence supports the juvenile court's finding that Mother failed to consistently engage in services that were designed to address Mother's behavioral issues.

Substantial evidence also supports the juvenile court's finding that Mother continued to engage in conduct that put Minor at risk. In arguing about the evidence of the September 2023 incident, Mother states only that "[t]he events of that evening were in dispute" and that she obtained a temporary restraining order against Father. Mother does not mention that she lied to the Agency about her response to the September 2023 incident. She does not mention the effects of that incident on Minor, including disturbed sleep and aggressive play. She does not mention the dyadic therapist's concerns that mother was redirecting Minor's thought processes by denying Minor's perception of events or paternal step-grandmother's concerns that Mother was giving Minor false information.

As to what the writ petition characterizes as a "toxic relationship" in the spring of 2024 (a relationship with at least 10 incidents of domestic violence that occurred before the police were finally called on May 4), Mother argues that "although she had been in a four-year relationship with her first abuser, she learned to recognize the red flags and had removed herself from a toxic relationship within approximately four months." She argues that she appropriately addressed the domestic violence in her relationship in spring 2024 by calling the police in May, moving from her apartment, and obtaining a restraining order. But she leaves out the compelling facts that support the juvenile court's decision: the events in mid-March, when Mother's boyfriend, angry with Mother, slapped Mother's friend and broke the windows of her

31

friend's car, after which Mother left the scene with the boyfriend and told police there was no disturbance; Mother's observed black eye a few days later, which she attributed to pink eye; Mother's failure to tell the Agency about the April 16 incident in which her boyfriend—who she told police had previously struck her—broke the door of her apartment; and that after the boyfriend punched her and strangled her on April 28, she took no action until a week later when she called the police only after the boyfriend sent her images showing that he had entered her apartment without her permission. She does not acknowledge that after the Agency learned about the police coming to maternal grandparents' home in May 2024, she lied when she said the police had been called because of a stolen phone and when she denied that there had been domestic violence. And Mother says nothing about the damaging effects of the police visit on Minor.

Mother cites *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 for the proposition that courts are concerned "only [with parents'] grasp of the important parenting concepts" when determining whether to deprive parents of custody. (*Id.* at p. 790.) Mother lists some of the important concepts identified in *David B.*, specifically, security, shelter, safety, and education. But she omits the concept identified in *David B.* that is most relevant here: "freedom from violence." (*Ibid.*) Nor does she discuss the evidence showing that she has not grasped that concept. For example, even though Mother testified that Minor had witnessed her being the victim of domestic violence with De.B., and that Minor had a strong reaction to conflict or yelling, Mother attributed that solely to Minor being a child. Mother says nothing in her argument about the effect on Minor of witnessing domestic violence against Mother or of seeing the aftermath, reflected in Mother's black eyes and other injuries. Nor does she mention the effect on Minor of her failure to

acknowledge Minor's experience. She says nothing about her refusal to comply with the therapist's advice that she engage with Minor about the September 2023 incident.

Mother suggests that she is being punished for being a victim of domestic violence, citing *In re Ma.V.* (2021) 64 Cal.App.5th 11. In *Ma.V.* the Court of Appeal reversed a jurisdictional order and observed that in cases "where children are brought into the dependency system because of domestic violence between the mother and a romantic partner," social service agencies and courts "continue to use the history of domestic violence as a basis to remove the children," even after the mother has distanced herself from the abuser. (*Id.* at pp. 25-26.) But this case is not like *Ma.V.*, which involved "stale evidence" of incidents of domestic violence that occurred 10 months before the jurisdiction hearing. (*Id.* at p. 22.) In *Ma.V.*, the mother had no further contact with the abuser and had not been involved in any sort of domestic violence after the case was filed. (*Id.* at p. 18.) Accordingly, the juvenile court there erred in focusing on the mother's past as a victim of domestic violence. (*Id.* at p. 23.) Here, however, in addition to years of domestic violence with De.B. that lasted until 2022 (even after the relationship ended and Mother obtained protective orders against him), there was domestic violence with Father in September 2023, followed by domestic violence with a new partner of three to five months standing that was serious enough to require law enforcement involvement just weeks before the continued 18-month review hearing. Unfortunately, the evidence is this case is far from stale; it reflects a continuing pattern that the juvenile court determined would put Minor at risk if she remained in Mother's care.

The other authorities that Mother cites likewise do not help her. This is not a case like *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, where the

33

parents fully participated in their service plans and made substantive progress on their plans. (*Id.* at p. 662.) That case involved "a theoretical and speculative future cycle of violence involving" the mother. (*Id.* at p. 663.) Here, Mother did not fully participate in her service plan, and there was evidence of a cycle of violence that continued through May 2024, the month in which the continued 18-month review hearing began. Nor is this case like *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, where even though the mother did not strictly comply with her case plan, she "substantially" complied. (*Id.* at p. 1343.)

In sum, we conclude that substantial evidence supports the juvenile court's findings that Mother failed to consistently engage in services and that Mother continued to engage in conduct that put Minor at risk. In light of those findings the juvenile court did not err in determining that returning Minor to Mother's care would create a substantial risk of detriment to Minor.

## DISPOSITION

Mother's petition for extraordinary writ is denied. Our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.450(a), 8.490(b)(2)(A).)

34

_____

Miller, J.


WE CONCUR:


_____

Richman, Acting P.J.


_____

Desautels, J.


A170877, *Roxanne R. v. Superior Court of San Francisco County*